UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------x
: 
UNITED STATES OF AMERICA : Case No. 3:00CR00170(SRU)
: 
v. : 
: 
DARRIN LMINGGIO : June 6, 2008
: 
-------------------------------------------------------x

## MOTION TO AMEND JUDGMENT

The defendant, Darrin Lminggio, respectfully requests that the Court amend the judgment in his case to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(2). The defendant asks this Court to enter an amended judgment reducing his sentence under the revised guidelines applicable to crack cocaine offenses from 165 months to 139 months.[1]

## AMENDMENT 706 AND THE CRACK-POWDER DISPARITY

Amendment 706 to the Sentencing Guidelines took effect on November 1, 2007. See U.S.S.G., App. C, Amdt. 706 (2007). This amendment alters the drug quantity table set forth in U.S.S.G. § 2D1.1, reducing by two levels the base offense levels for offenses involving crack cocaine. See id. The amendment was adopted in an effort to address, at least in small part, the dramatic and unfair disparity between sentences for offenses involving crack cocaine and otherwise similar offenses involving powder cocaine. See id.

The unfairness of the disparate treatment between crack and powder cocaine offenses is well-documented and indisputable. See generally United States Sentencing Commission, Report

---

[1] The defendant's original sentence represents a point 23 months below the top of the previously applicable Guideline range of 151 to 188 months. The defendant requests that his adjusted offense level be reduced by two levels, from 29 to 27, resulting in a new Guidelines range of 130 to 162 months. A point 23 months below the top of this new range would be 139 months.

to Congress: Cocaine and Federal Sentencing Policy (May 2007) (hereinafter "2007 Sentencing Commission Report"); see also Kimbrough v. United States, 128 S. Ct. 558, 568-69 (2007). The disparity itself and the underlying assumptions giving rise to it have largely been discredited, as described by the Supreme Court in Kimbrough:

> First, the Commission reported, the 100-to-1 ratio rested on assumptions about the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support. [The] ratio Congress embedded in the statute far 'overstates' both 'the relative harmfulness' of crack cocaine, and the 'seriousness of most crack cocaine offenses'. For example, the Commission found that crack is associated with 'significantly less trafficking-related violence . . . than previously assumed.' It also observed that 'the negative effects of prenatal crack cocaine exposure are identical to the negative effects of prenatal powder cocaine exposure.' The Commission furthermore noted that 'the epidemic of crack cocaine use by youth never materialized to the extent feared.'
>
> Second, the Commission concluded that the crack/powder disparity is inconsistent with the 1986 Act's goal of punishing major drug traffickers more severely than low-level dealers. Drug importers and major traffickers generally deal in powder cocaine, which is then converted into crack by street-level sellers. But the 100-to-1 ratio can lead to the 'anomalous' result that 'retail crack dealers get longer sentences than the wholesale drug distributors who supply theym the powder cocaine from which their crack is produced.'
>
> Finally, the Commission stated that the crack/powder sentencing differential 'fosters disrespect for and lack of confidence in the criminal justice system' because of a 'widely-held perception' that it 'promotes unwarranted disparity based on race.' Approximately 85 percent of defendants convicted of crack offenses in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed 'primarily upon black offenders.'

Kimbrough, 128 S. Ct. at 568 (internal citations omitted).

The Supreme Court found that it was not unreasonable for a district court to conclude that the 100-to-1 "crack/powder disparity is at odds with § 3553(a)," resulting in sentences greater than necessary to serve the required purposes. Id. After Kimbrough was decided, the Sentencing Commission made its amendments to § 2D1.1 retroactive – an unusual step – in an effort "to alleviate some of the urgent and compelling problems associated with the penalty

structure for crack cocaine offenses." See Sentencing Guidelines for United States Courts, 73 Fed. Reg. at 220. In fact, the Sentencing Commission emphasized that the amendment is not a complete response to the serious inequities in the Sentencing Guidelines for crack offenses:

> The Commission . . . views the amendment only as a partial remedy to some of the problems associated with the 100-to-1 drug quantity ratio. It is neither a permanent nor a complete solution to these problems. Any comprehensive solution requires appropriate legislative action by Congress. It is the Commission's firm desire that this report will facilitate prompt congressional action addressing the 100-to-1 drug quantity ratio.

2007 Sentencing Commission Report, at 10.

It was a recognition of a very serious flaw in the sentencing guidelines that led to the amendment at issue here. There can be no question but that "the crack/powder disparity produces disproportionately harsh sanctions, i.e., sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of sentencing set forth in § 3553(a)." Kimbrough, 128 S. Ct. at 575. The significance of this flaw is not lessened by the details of a specific defendant's criminal history. Mr. Lminggio's sentence was unjustly severe, partly because of the dramatic disparity between crack and powder cocaine offenses in the guidelines applicable at the time of his sentencing – guidelines which were then binding on this Court. The Sentencing Commission recognized this injustice and set out to address it by enacting an amendment that would close the gap, if only slightly, between sentences for the two forms of cocaine. Mr. Lminggio is no less entitled to a correction of the injustice of the old crack guidelines than is any other defendant.

**A.     The Defendant's Base Offense Level Has Been Reduced by the Amendment.**

The Government has filed a memorandum arguing that Mr. Lminggio is not eligible for a reduction in his sentence and stating: "The new crack guidelines are inapplicable to the defendant because they do not reduce the defendant's sentencing guideline range." Gov't Memo. at 1. [Doc. # 35] The Government makes two arguments in support of its position. First, the

Government asserts that Mr. Lminggio's base offense level has not changed, because of the operation of the drug equivalency table.  See Gov't Memo. at 7, n.4.  The Government's memorandum, which was filed on April 4, 2008, was correct in this calculation (though not, in the defendant's view, in its legal impact) at the time of its filing.  However, the relevant application notes governing implementation of the drug equivalency table were amended effective May 1, 2008.  See *Notice of final action regarding amendments to a policy statement and commentary effective May 1, 2008*, United States Sentencing Commission.[2]

Under the revised version of Application Note 10(D) to § 1B1.10 of the Guidelines effective May 1, 2008, Mr. Lminggio's base offense level is, in fact, reduced.  When he was originally sentenced, Mr. Lminggio was found to be responsible for 13.81 grams of heroin and 0.9 grams of crack.  Under the equivalency tables, the heroin was converted to 13.81 kilograms of marijuana, and the crack was converted to 18 kilograms of marijuana.  The combined total of 31.81 kilograms of marijuana dictated a base offense level of 18.  The Application Note as revised instructs that, in most cases, "if the offense involves cocaine base ('crack') and one or more other controlled substances, determine the combined offense level as provided by subdivision (B) of this note, and reduce the combined offense level by 2 levels."  U.S.S.G. § 1B1.10 cmt. n. 10(D)(I) (May 1, 2008).[3]

**It is thus apparent that Mr. Lminggio's <u>base offense level</u> has been reduced by the retroactive amendments to the Sentencing Guidelines.**  His base offense level at the time of

---

[2] Available online at http://www.ussc.gov/FEDREG/2008_noticeoffinalaction.pdf.

[3] There are three exceptions to this general rule: (1) if more than 4.5 kg of crack are involved; (2) if less than 0.25 grams of crack are involved; or (3) the resulting reduced offense level is lower than the base offense level would be if the crack were not involved at all.  See U.S.S.G. § 1B1.10 cmt. n. 10(D)(ii).  The first two exceptions clearly do not apply to this case.  Likewise, the third is inapplicable; the offense level counting only the heroin would be 16.

his original sentencing was 18; now it is 16.

**B.     The Defendant's Sentence Was "Based On" § 2D1.1.**

Although Mr. Lminggio's base offense level, as determined by § 2D1.1 of the Guidelines, has in fact been reduced by the amendment, the Government asserts that Mr. Lminggio is ineligible to reap any benefit from the amendment because he was found to be a "career offender" under the then-mandatory Guidelines.[4] The Government contends that Mr. Lminggio's sentence therefore "did not rest on the provision regarding crack cocaine in Section 2D1.1, which has been amended." Gov't Memo at 6. The Government concludes that "the new crack guidelines do not lower the defendant's guideline calculation" and that he therefore is not entitled to have his sentence reconsidered by the Court. Id. at 17. The defendant respectfully disagrees.

Section 3582(c)(2) requires only that a defendant's guideline range have been "based on" a guideline provision that was retroactively lowered, in order to qualify for a reduction. See 18 U.S.C. § 3582(c)(2). Mr. Lminggio's term of imprisonment was "based on" the old drug quantity table – even though his guideline range was ultimately increased under Chapter 4 of the Guidelines – and, as set forth above, the sentencing range applicable to him under that table has been reduced by the amendment. He therefore is entitled to a resentencing.

It is impossible, in applying the Guidelines properly, to "base" a defendant's guideline range on the career offender provision standing alone. The offense level called for by the career

---

[4] The Government's memorandum contends that "[c]ourts which have addressed the career offender scenario are unanimous" in holding that no reduction is permitted for such defendants. Gov't Memo at 7. Whether or not that was the fact at the time the Government prepared its memorandum, it is not now correct; several courts have granted reductions in cases in which the defendant qualified as a career offender and in which § 4B1.1 was one of the bases for the sentence imposed. See, e.g., United States v. Nigatu, 2008 WL 926561 (D. Minn. Apr. 7, 2008); United States v. Poindexter, 2008 WL 1946821 (E.D. Pa. May 2, 2008); United States v. Darrell Harris, 3:97CR00171(RNC), Doc. # 51, ruling dated May 12, 2008.

offender provision requires comparison with the base offense level before it can be applied. See U.S.S.G. § 4B1.1(b) (Nov. 2007) ("if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply").  A guideline range that is adjusted under the career offender provision is actually "based on" the guideline sentence that results from applying Chapters 1 through 3 of the Guidelines, because the determination of this range is necessary to trigger application of the career offender enhancement.

The Guidelines are applied in order, starting with Chapter 1 of the Guidelines Manual and ending with Chapter 5.  See U.S.S.G. § 1B1.1 (Nov. 2007).  In no case can a court simply jump to Chapter 4 and apply the career offender guideline.  In other words, application of a Chapter 4B enhancement is neither the beginning nor the end of the calculation of a defendant's guideline range.  Rather, it is simply one step in doing so.  And that being so, a defendant's guideline range is "based on" Chapters 1, 2, 3 and 5, even if the defendant receives a Chapter 4 enhancement.

The Government's argument that application of the career offender provision means that a defendant's guideline range "did not rest on" § 2D1.1 improperly attempts to rewrite § 3582(c)(2) to mean something it plainly does not mean, and cannot mean, in light of the structure of the Guidelines.  Under the Government's reading, only a defendant whose sentence was based **entirely and solely** on the amended provisions of § 2D1.1 is eligible for resentencing.  Such an argument disregards the complex nature of a Guidelines calculation.

**The Supreme Court has acknowledged that a sentence under the Guidelines regime is not "based on" just one factor or provision.**  To the contrary, "district court judges determine sentences based on the various offense-related and offender-related factors identified by the Guidelines of the United States Sentencing Commission."  Burns v. United States, 501

U.S. 129, 133 (1991) (emphasis added); cf. United States v. Fuller, 426 F.3d 556, 558 (2d Cir. 2005) (noting that "the District Court sentenced Fuller principally to 151 months' imprisonment in part based on multiple upward departures pursuant to the" Guidelines).  Every sentence under the Guidelines system is determined "based on" a variety of factors and provisions.  Every sentence is based – in part – on three, four, five, or more provisions in the Guidelines manual.

The word "base," when used as a verb, means "to make, form, or serve as **a** base for." Merriam-Webster Online Dictionary, 2008 (emphasis added).[5]  There is an important difference between this definition, and the one the Government proposes, which would be "to make, form, or serve as **the** base for."

When a defendant is convicted of an offense involving crack cocaine, the provisions of § 2D1.1 always come into play – but only as one of many factors that are eventually considered in reaching a recommendation under the Guidelines.  Indeed, it is practically unheard of for a Guidelines range to be calculated solely on the basis of § 2D1.1; to the contrary, the great majority of sentencing calculations require consideration of numerous provisions of the Guidelines Manual.  An offense level may be increased or decreased to account for, inter alia, the defendant's role in the offense, the nature of the victim, the means used to commit the offense, the defendant's record of previous convictions, the defendant's lack of honesty in dealings with the Court, or his assistance to the Government.  A sentence in a crack cocaine case that is arrived at after application of the Guidelines provisions relating to these factors is still "based on" § 2D1.1.  Sometimes, the eventual sentence arrived at seems to bear little relation to the base offense level determined by § 2D1.1, but **no matter the end result, no matter the twists and turns taken to arrive there, that sentence is – at least in part – "based on" § 2D1.1.**

---

[5] Available online at www.merriam-webster.com/dictionary/base.

Even the language of the PSR, when compared to the language of § 3582, suggests that Mr. Lminggio is eligible for resentencing. The PSR states quite clearly that the "base offense level" applicable to Mr. Lminggio's offense – and the starting point for the determination of the appropriate sentence in his case – was 18, and that the base offense level "is found in Guideline § 2D1.1." PSR ¶ 24. What else could the **"base offense level"** be but the offense level on which, in the first instance, the defendant's guideline range is **based**? It is of course true, as discussed above, that other sections of the Guidelines came into play after the base offense level was determined, but <u>none of the adjustments made after the initial determination can undo the fact that the base offense level was determined by § 2D1.1</u>. Would a defendant's sentence not be "based on" § 2D1.1 if, after the base offense level is determined under that section, the level was then adjusted under § 3B1.1 or § 3B1.2 to reflect the defendant's role in the offense? Would a defendant's sentence not be "based on" § 2D1.1 if the offense level is adjusted under § 3E1.1 to award credit for acceptance of responsibility?

The fact is, a Guidelines sentence is "based on" a variety of factors, and in this case, the starting point – the true <u>base</u> on which the determination as to what an appropriate sentence would be for Mr. Lminggio was built – was the offense level of 18 assigned by § 2D1.1. That offense level has been amended, and Mr. Lminggio should get the benefit of that amendment.

There is another problem with the Government's argument that Mr. Lminggio, as a career offender, is <u>per se</u> barred from resentencing. After <u>Booker</u>, <u>Kimbrough</u>, and <u>Hicks</u>, this Court may consider, in fashioning an appropriate sentence, the disparity between a defendant's § 2D1.1 guideline range and the range that is suggested by § 4B1.1. In other words, the Court may find that the increased sentence called for by a career offender enhancement is unreasonable when compared to the otherwise applicable Guidelines sentence. In making that determination, the

Guidelines range that would be applicable <u>without</u> the career offender enhancement – which, in this case, is set by § 2D1.1 – is obviously significant. The change in the § 2D1.1 range occasioned by the recent amendments is, therefore, also of significance.

If this Court determines that it would have imposed a lower sentence had the base offense level under § 2D1.1 been two levels lower (which would have made the differential between the ordinary crack guideline range and the career offender crack guideline range even greater), then the defendant's sentence was based on a guideline range that has been subsequently lowered by the amendments. Moreover, this Court has the jurisdiction to make its own determination as to its jurisdiction to lower Mr. Lminggio's sentence. <u>See</u>, <u>e.g.</u>, <u>United States v. Ruiz</u>, 536 U.S. 622, 628 (2002) ("a federal court always has jurisdiction to determine its own jurisdiction").

**C.     <u>The Crack/Powder Disparity May Be Considered in a § 3582 Resentencing.</u>**

Prior to the Supreme Court's decisions in <u>Kimbrough</u> and <u>Gall</u>, sentencing courts erroneously believed that they were not permitted to consider the inequity of the vast disparity between penalties for crack and cocaine offenses in determining an appropriate sentence. Now, that disparity is a permitted consideration. The Second Circuit has recently noted that <u>Kimbrough</u> and <u>Gall</u> confirm

> the broad deference that this Circuit has afforded the sentencing discretion of the district courts. However, until <u>Kimbrough</u> and <u>Gall</u>, this Circuit tended to discourage district courts from deviating from the crack cocaine Guidelines. Our opinion in <u>United States v. Castillo</u>, 460 F.3d 337 (2d Cir. 2006), may have been over-read or misread to inhibit any deviation. District courts may also have been inhibited from exercising their full discretion by the fact that the Sentencing Commission borrowed the 100-to-1 Guidelines ratio from the mandatory minimums for drug offenses decreed by Congress. <u>Id.</u> at 567 (explaining origin of Guidelines crack to powder ratio). Therefore, when a district court sentenced a defendant for a crack cocaine offense before <u>Kimbrough</u>, there was an unacceptable likelihood of error; certainly, the court acted under the influence of a widespread assumption that is now known to be erroneous.

<u>United States v. Regalado</u>, 518 F.3d 143, 147 (2d Cir. 2008). The Second Circuit went on to

give specific instructions to district courts faced with a resentencing pursuant to the crack amendments:

> In deciding whether to modify the sentence, district courts must consider the factors set forth in 18 U.S.C. § 3553(a) anew and in light of Gall and Kimbrough to the extent that they may be applicable, and relevant Sentencing Commission policy statements. See 18 U.S.C. § 3582(c)(2).

Id. at 151. In other words, this Court may not have been aware, at the time Mr. Lminggio was sentenced in 2001, of the full scope of its authority to consider the disparity between crack and powder sentences, and thus, it may take that factor into account now.

### D.    Sentencing Disparity Among Otherwise Similar Defendants.

One of the factors that the Court is required to consider in determining an appropriate sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (2008). One of the effects of the recent – but very limited – amendments to the Guidelines is that some defendants may qualify for a reduction while others may not, even though all were convicted of very similar conduct. This new form of disparity in sentencing among defendants may be considered by the Court in determining an appropriate sentence.

Courts in this District have already issued amended judgments reducing the sentences of over 120 defendants since March 3, 2008. Many more motions remain under consideration, and many motions that were denied on are on appeal to the Second Circuit. Nationally, nearly 5,000 defendants had received sentence reductions as of May 13, 2008. See U.S. Sentencing Commission, Preliminary Crack Cocaine Retroactivity Data Report, May 2008, at Table 1.[6] Of those defendants whose sentences were reduced, more than 10% were in Criminal History

---

[6] Available online at: http://www.ussc.gov/USSC_Crack_Cocaine_Retroactivity_Data_Report_19_May_08.pdf

Category VI. See id. at Table 5.[7]

The Guidelines system was created to reduce the disparity among sentences "imposed by different federal courts for similar criminal conduct by similar offenders." U.S.S.G. § 1A1.1 cmt. n. 3 (2008). Presumably, all defendants who are found to be in Criminal History Category VI are to be considered "similar" at some basic level for purposes of sentencing. But under the Government's approach, some CHC VI defendants who committed crack offenses are eligible for reductions and others are not, with the only difference being which section of the Guidelines dictated their placement in CHC VI. Mr. Lminggio was sentenced for a crack offense in CHC VI. Some defendants who were sentenced for crack offenses in CHC VI – about 500 of them – have gotten reductions. The mere fact that Mr. Lminggio happens to be a CHC VI because of his status as a career offender should not prevent him from getting the same reduction.

**E.  The § 3553 Factors Support a Reduction in Mr. Lminggio's Sentence.**

When he was originally sentenced by this Court, Mr. Lminggio was a healthy 29 year old man. PSR ¶ 60. He was addicted to and using illegal drugs; he had minimal experience with drug treatment programs. PSR ¶¶ 61, 62. The PSR concludes with the following evaluation:

> Mr. Lminggio can readily admit his failures over the last ten years, attributing his problems to drug use, bad judgment and his desires for nice things. He believes that recognizing these failures will help him make changes to become a more productive and contributing member of the community when he is released. While incarcerated, Mr. Lminggio would benefit from participating in any educational, vocational training and counseling that may be available so, when he is released, he will have the tools necessary to accomplish his goals.

PSR ¶ 89. Mr. Lminggio clearly took this statement to heart.

Attached to this memorandum are copies of certificates Mr. Lminggio has earned since he

---

[7] The report does not reveal the basis for these defendants' placement in CHC VI, that is, whether they accrued at least 13 criminal history points and/or whether they qualified as "career offenders."

has been incarcerated for completing the following:

- "Cage Your Rage" program (May 31, 2002)
- "Lifestyle Issues" program (December 17, 2002)
- The Victim Impact Program (July 2002 to March 2003)
- Drug Abuse Education (February 26, 2003)
- "Beat the Street" program (September 2, 2003)
- Industrial Training Course in Soldering Electrical (January 31, 2008)

On July 17, 2007, Mr. Lminggio was awarded his high school diploma. In October 2007, he was awarded a certificate of merit for outstanding work performance at the UNICOR factory where he is employed.

There is a noticeable gap in Mr. Lminggio's educational and vocational activities from late 2003 through 2007. This gap has a tragic explanation. In 2003, Mr. Lminggio began complaining of pain in his right foot; he informed medical staff at the prison that the medicine he had been given was not helping the pain.[8] In April 2003, a prison medical report reports "no sign of infection." In May 2003 he returned to medical and was prescribed warm compresses and ibuprofen. In October 2003, a prison medical report attributes the pain to a badly clipped toe nail and prescribes motrin. A November 2003 report notes that the skin is warm and red, and on November 21, 2003, Mr. Lminggio was diagnosed with gout by a physicians' assistant at the prison. On December 1, 2003, a D.O. (osteopathic doctor) diagnosed Mr. Lminggio with cellulitis.

On December 29, 2003, Mr. Lminggio reported suffering chest pain, throat pain, and being unable to eat. On that occasion, the D.O. stated in the report: "I suspect he may be noncompliant with his meds" and noted that "he was witnessed by pharmacy as acting normal." Finally, on January 8, 2004, he was seen by a doctor outside the prison and diagnosed with an

---

[8] The medical reports will be filed separately, with a motion to seal, in order to protect the defendant's personal information.

arterial occlusion – a blocked artery in his foot. Further tests were done, and shortly thereafter Mr. Lminggio was found to have gangrene in his right foot.[9]

On January 28, 2004, Mr. Lminggio's right leg was amputated at the knee.

So today, as Mr. Lminggio comes before this Court seven years after his last appearance, Mr. Lminggio is a changed man. He is nearly 37 years old. He has two children, ages 16 and 8, to whom he wants desperately to be a father figure. He has a variety of health problems. He has lost his ability to walk without assistance. He is clean and sober. He has a high school diploma. He has learned a trade, obtained a sought-after job, and been commended for his exemplary work performance. He is equipped with anger management and coping skills. He has done everything the PSR recommended. He has learned from his mistakes, taken advantage of every opportunity offered him in prison, and tried, in spite of great physical pain, to prepare himself for a good life on the outside. He has the "the tools necessary to accomplish his goals." PSR ¶ 89.

Mr. Lminggio also knows that after his term of incarceration is complete, he will be subject to five years of supervised release. He is fully aware of the serious consequences that will result if he violates the conditions of his release. The changes in his life over the past seven years have been dramatic, and all will greatly reduce the risk that Mr. Lminggio will reoffend. This Court need not detain Mr. Lminggio in prison any longer than necessary under the amended guidelines in order to effectuate the purposes of a sentence; the period of supervision and the threat of re-incarceration will continue to satisfy the needs for specific deterrence, protection of the public, and just punishment.

Mr. Lminggio respectfully asks this Court to consider his <u>new</u> personal characteristics, as required under § 3553, and find that he is deserving of a reduction in his sentence.

---

[9] Related to the gangrene, Mr. Lminggio also developed a pulmonary embolism.

**CONCLUSION**

The Western District of Virginia, in holding that a defendant should receive a reduction in his sentence, summarized the core basis for its decision succinctly and eloquently:

> The Sentencing Commission amended the sentencing guidelines to correct what many have perceived as gross inequities between sentences for crack cocaine offenses and sentences for powder cocaine offenses. The Commission, with widespread support in the judiciary, made the amendments retroactive. This defendant, like 19,500 similarly situated inmates across the nation, is not the undeserving recipient of blind fortune. His sentence is being reduced because in the judgment of the Commission, the judiciary, Congress, and much of America – with whom I heartily concur – his original sentence was unfairly harsh when compared to sentences given to defendants for powder cocaine offenses. In truth, his reduced sentence continues to reflect the disparity between the punishments for powder cocaine and crack cocaine offenses, but it is a step in the right direction.

United States v. Ayala, 540 F. Supp. 2d 676, 680 (W.D. Va. 2008).

For the reasons set forth above, the defendant, Darrin Lminggio, respectfully urges the Court to issue an amended judgment reducing his sentence in accordance with the amended guidelines applicable to crack cocaine cases from 165 months to 139 months.

Respectfully submitted,

The Defendant,
Darrin Lminggio

Thomas G. Dennis
Federal Defender


Dated: June 6, 2008                            _____/s/_____
                                               Sarah A. L. Merriam
                                               Assistant Federal Defender
                                               265 Church Street, Suite 702
                                               New Haven, CT  06510
                                               Bar No. ct25379
                                               Phone: 203-498-4200
                                               Fax: 203-498-4207
                                               Email: sarah_merriam@fd.org

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on June 6, 2008, a copy of the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                            /s/
                                  Sarah A. L. Merriam